NORTHWESTERN LIFE INSURANCE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9698. Promulgated February 13, 1928.

*H. B. McCawley, Esq.*, for the petitioner.
*L. A. Luce, Esq.*, for the respondent.

678

[redacted]

OPINION.

LITTLETON: The sole question at issue in this case is whether the entire amount received by the petitioner as premiums upon the life insurance policies which it issued in 1920, or on account of similar policies which it issued in 1919 and were in force in 1920, constitutes a part of gross income for 1920, or whether a part of such premiums was not, in fact, premiums in the sense which the term is ordinarily used, but was a loan or advance by policyholders to petitioner. The contention of the petitioner is that when premiums were being charged on the basis of a $5,000 policy, and such policy did not provide for insurance to the extent of $5,000 until after the policy had been in effect for at least four years, " that portion of the payments representing excess over the premium on the amount of insurance actually in force does not constitute income within the meaning of section 213, Revenue Act of 1918," in that such excess " was an advance to the company by the policyholders, which the company was obligated to return at the end of a definite period."

Section 233 (a) (1) of the Revenue Act of 1918 provides as follows, with respect to gross income of life insurance companies:

(a) That in the case of a corporation subject to the tax imposed by section 230 the term " gross income " means the gross income as defined in section 213, except that:

(1) In the case of life insurance companies there shall not be included in gross income such portion of any actual premium received from any individual

policyholder as is paid back or credited to or treated as an abatement of premium of such policyholder within the taxable year.

As far as material to the question at issue, section 213 provides that the term " gross income " includes " gains, profits, and income derived from * * * businesses, * * * or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

Petitioner concedes that no portion of the premiums here in question was " paid back or credited to or treated as an abatement of the premium of such policyholder within the taxable year," but says the error lies in designating the entire amount of the premium as a part of gross income when the petitioner was obligated to return a portion of the premium at a later date. Our question then is as to the nature of these so-called premiums, and the character of the obligation which devolved upon the petitioner upon the receipt of such premiums.

While it is apparent that the payment of premiums on the basis of a $5,000 policy when insurance became effective for a smaller amount, presents an unusual situation, we fail to see wherein the petitioner has satisfied the burden imposed upon it of showing that the entire amount does not constitute income to it. In the first place, the petitioner failed to establish the contention advanced that the payments were in furtherance of a contract under which it was agreed that the excess payments would be repaid in the form of stock or cash upon the formation of a stock company which was apparently in contemplation from the beginning. It is true that in the " Proxy " which was given by each policyholder consent was given to the formation of a stock company under certain conditions, and it is also true that the policy provided for the payment at the end of five years to policyholders of this class of savings which resulted from the fact that the amount payable in case of death during the first four years was less than the amount upon which premiums were being paid, but such facts fall short of establishing that when the premiums were being paid a loan was being made to the petitioner which would be repaid through the issuance of stock. In any corporation where income is earned there is at least an indirect obligation on the part of the corporation ultimately to pay this income to the stockholders, but this is not a liability which would serve to make the income nontaxable. The income when earned is owned by the corporation, which is an entity separate and apart from the stockholders. In a mutual life insurance company it is likewise true that the excess in premiums over actual cost of insurance will later be returned to the policyholders, but no part of the

amount received, whether excess or otherwise, can be considered a direct liability of the company until apportioned or set apart for return to the policyholders. In other words, the amount which is to be distributed is not to be determined until after the sum-total of the company's operations is considered, as well as the necessity for retention of the surplus or some part for the security and future needs of the business. In the case of *Greeff* v. *Equitable Life Assurance Society of United States*, 54 N. E. 712; 160 N. Y. 19, the court said:

In a sense, all the funds in the possession of a mutual insurance company, over and above its immediate and present liabilities, may be regarded as surplus, yet it is not for that reason understood as belonging to, or to be immediately distributed among, the policy holders, either by them or by the company. If the same exaggerated meaning were to be given to the word "liabilities," when applied to demands against the company, as was given to the word "surplus," it would include the full face amount of all its outstanding risks or policies, and no surplus would ever exist.

In the case at bar excessive premiums were apparently being charged on the policies which were being issued, and it also appears that whatever savings resulted from the methods pursued by the petitioner would later be returned to the policyholders, but whether any amount would be returned or how much was dependent entirely on the hazards of the business. Expenses of the company had to be met and they were met out of the total premiums received. Whatever was left became a part of surplus which might be distributed or apportioned to the various policyholders. The manner in which the " excess " in question was determined by the petitioner, in urging its contention before the Board, is shown by the following testimony of one of the organizers of the company and a former officer:

Q. Mr. Rodman, can you take a single policy, at any age selected by yourself, and show the difference between the amount paid for actual insurance protection and the total amount paid to the company for that year—just one example?

A. I can by referring to the tables that are worked out, referring to the compilation of figures made by the company. Policy number 191 issued to B. P. Peterson, issued on May 13, 1919, at age 30—premium was $173.80. Saving set aside to this policyholder during the first year, 1919, is $20.86, and the second year would be $40.20. This amount is ascertained in the following manner: only one-fifth of the premium the first year is required to cover the actual insurance in force, leaving an excess payment of $138.04 by the policyholder, from which $118.18 was deducted as a commission, leaving a balance of $20.86. In the second year of the policy, 1920, the policyholder paid in an excess of $104.28. There was a reserve of $55.74, and a commission of $8.34 deducted from this $104.28, leaving a total credit on the stock subscription of $40.20 out of the second year. The total cash paid in surplus on this basis for 1919, amounted to $4,318.41, and for the year 1920, on the same basis, it amounted to $31,143.81.

That is, four-fifths of the premium received in the first year was considered "gross excess" and the "net excess" was the difference between the "gross excess" and the commission on such "gross excess." In the second year three-fifths of the premium paid would constitute the "gross excess" from which would be deducted the renewal premium plus the reserve set up against this policy to arrive at the "net excess." The sum of the "net excess" amounts on the various policies issued, or in force, in 1920 as computed in the foregoing manner by the petitioner was $31,143.81. This amount, however, was subject to further reductions to the end that even if the petitioner's theory and computation could be accepted the "net excess" would amount to only $21,127.81. The petitioner makes the following comment in its brief with respect to this further reduction:

The aggregate excess payments during 1920 were reduced by necessary disbursements on account of commissions paid to agents and by amounts set aside to meet legal reserve requirements, leaving a balance of $31,143.81, which was further reduced by other necessary expenses to the amount of $21,127.81. The petition alleges that the Commissioner has treated capital contributions as earned premiums in the sum of $31,143.81. The proof shows, however, that the amount accumulated by the Company during the year from the voluntary excess payments was $21,127.81.

The evidence shows further that no liability was set up on petitioner's books in the year on appeal on account of these "excess payments" or so-called "loans," nor did the report required by the State of Nebraska show the existence of such a liability, the entire surplus of the petitioner being shown in this report as "Unassigned funds (Surplus)."

From the foregoing, it appears that the entire amount received was treated as funds in the hands of the petitioner which were available for its general purposes, and that whatever liability existed on account of these so-called "excess payments" was not other than that which would arise in any similar company where the amounts paid by policyholders exceed the cost of the insurance on account of which payment is being made.

The Board is, accordingly, of the opinion that the entire amount received by the petitioner as premiums must be treated as a part of its gross income and that it has not been established that any part of such premiums was in the nature of loans made by policyholders to the petitioner.

*Judgment will be entered for the respondent.*